**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4954-18T2

MICHELLE SHELDON,

    Plaintiff-Appellant,

v.

THE COOPER HEALTH
SYSTEM and LARRAINE
RAMOS,

    Defendants-Respondents.

_____

Argued telephonically September 14, 2020 –
Decided October 6, 2020

Before Judges Currier, Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-0350-17.

R. Armen McOmber argued the cause for appellant (McOmber McOmber & Luber, PC, attorneys; R. Armen McOmber and Matthew A. Luber, of counsel and on the briefs).

Joseph G. Antinori argued the cause for respondent (Brown & Connery, LLP, attorneys; Christine P.

O'Hearn, Joseph G. Antinori, and Andrew S. Brown, on the brief).

PER CURIAM

Plaintiff Michelle Sheldon appeals from the June 26, 2019 Law Division order granting her former employer, the Cooper Health System (Cooper), and Lorraine Raimo,[1] a director, summary judgment dismissal of her disability discrimination complaint stemming from her August 7, 2015 termination.  Because the judge failed to make any findings or state any reasons for his decision as required by Rule 1:7-4(a), we vacate the order under review and remand the matter for further proceedings.

To lend context to the appeal, we detail the facts from evidence submitted by the parties in support of, and in opposition to, the summary judgment motion, viewed in the light most favorable to plaintiff.  Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013) (citing Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995)).  In 2010, Cooper hired plaintiff in its urogynecology department as a clinical practice assistant.  Plaintiff's job duties included scheduling and canceling patient appointments, taking vitals of patients, calling in prescriptions, running urodynamic testing with nurse practitioners, and assisting doctors.  On October 9, 2013, while

_____

[1] Lorraine Raimo was incorrectly pled as Larraine Ramos.

2                                                          A-4954-18T2

employed at Cooper, plaintiff "slipped and fell" in the parking lot of a Wawa and sustained injuries to her neck, back, foot, and ankle. Plaintiff did not seek immediate medical care for her injuries and returned to work within days, despite experiencing pain.

When the pain persisted, plaintiff retained an attorney who advised her to seek medical treatment, as a result of which plaintiff was treated by her "family doctor" as well as other medical professionals, including Dr. Young Lee, a pain management specialist, Dr. Brandon Bird, a chiropractor, and Dr. Jack Bondi, a podiatrist. Plaintiff also underwent several MRIs. Plaintiff's diagnoses included "cervical disc herniation[s][,]" "lumbar facet syndrome[,]" "disc bulging[,]" "clinical lumbar radiculopathy[,]" "sacroiliitis[,]" "avascular necrosis of bone[,]" "ankle sprain and strain[,]" "closed ankle fracture[,]" and "osteochondritis[.]" She was prescribed medications, physical therapy, a back brace, and an orthopedic boot. At her deposition, plaintiff testified she eventually stopped seeking treatment for the injuries, primarily because she refused to take the prescribed medications, the chiropractic treatment was too painful, and she rejected the surgical option recommended by the podiatrist. She also stopped wearing the back brace because "[i]t hurt."

A-4954-18T2

On April 17, 2014, approximately six months after the slip and fall, plaintiff requested a leave of absence from Cooper via its online platform, asserting that she had a "serious health condition." A supporting prescription form prepared by Dr. Bondi on April 17, indicated that plaintiff would be absent from work pending test results. Cooper granted plaintiff the requested leave from April 18, to September 12, 2014.

On February 5, 2015, after plaintiff returned to work, she filed a personal injury lawsuit against Wawa and another defendant, alleging that she was "severely and permanently injured" as a result of her fall on Wawa's property (the Wawa lawsuit). A few months later, on May 14, 2015, plaintiff submitted another leave of absence request form to Cooper for her "serious health condition." In a medical certification submitted to support her request for leave under the Family and Medical Leave Act (FMLA), N.J.S.A. 34:11B-1 to -16, plaintiff's chiropractor, Dr. Bird, averred that plaintiff was "unable to perform any of . . . her job functions due to [her health] condition,"[2] and that her

---

[2] Dr. Bird identified the specific job functions plaintiff was unable to perform as "walking, standing, bending, and lifting." In a subsequent request for plaintiff's medical records submitted to Dr. Bird by a physician at plaintiff's disability insurance carrier, the physician identified some of plaintiff's occupational demands as "[f]requently standing, walking, reaching," and "lift[ing] . . . up to [ten] pounds of force" as well as "[o]ccasionally sitting," and "lift[ing] . . . up to [twenty] pounds of force."

"condition [would] cause episodic flare-ups periodically preventing [her] from performing . . . her job functions." Dr. Bird estimated that plaintiff's period of incapacity would end on June 20, 2015.

Plaintiff testified she requested the second leave of absence because when she "bent down to put a chart into [a] file" at work, she "couldn't get back up" and "had to kind of crawl to [her] co-worker[']s chair to get [her]self back up." According to plaintiff, she "finished [the] day out, and then went to the chiropractor . . . crying" because of the pain. Plaintiff acknowledged that instead of being sympathetic, her co-worker, Melissa Butts, observed plaintiff crawling and said, "'[y]ou're laying that on a little thick,' implying that she . . . felt [p]laintiff was over-exaggerating her injury."

Cooper granted plaintiff the requested leave from May 18 to June 20, 2015, and then extended the leave period, first to July 17, 2015, and then to August 28, 2015, based on plaintiff's submission of two respective prescription notes prepared by Dr. Lee, her pain management doctor, stating that plaintiff was "unable to return to work." In order to receive temporary disability benefits during her second leave of absence,[3] plaintiff certified in a May 23, 2015 claim submission to the Department of Labor and Workforce Development, Division

---

[3] Plaintiff exhausted her accrued paid time off during her leave of absence.

A-4954-18T2

of Temporary Disability Insurance, that she sustained "[two] [h]erniated [b]ulging disc[s]" from a fall that were "giving [her] severe pain in [her] back and legs," and, as a result, she had been unable to work since May 18.

While plaintiff was out of work during her second leave period, Cooper began to receive complaints from other employees questioning plaintiff's health status. On June 10, 2015, the following complaint was submitted to Cooper's anonymous ethics complaint hotline:

> [Plaintiff] is abusing the [FMLA]. [Plaintiff] is currently on [another] medical leave that only takes place during the summer months. [Plaintiff] does not see any Cooper physicians, she utilizes outside physicians. Other employees follow her on social media and she posts pictures of her swimming and attending barbeques. [Plaintiff] is supposed to be in a back brace and at these events, she is not wearing the brace. Employees are becoming frustrated with her absence because [plaintiff] is abusing the medical leave. [Plaintiff]'s work is being divided amongst other employees and it is overwhelming.

On June 19, 2015, a second anonymous complaint was submitted to the hotline, stating that plaintiff was "out on FMLA due to a leg issue. . . . [but] there [was] nothing wrong with [her]." The complainant stated that plaintiff "went on vacation[,]" "went bowling[,]" and "uploaded a video of her swimming." The complainant asserted that plaintiff "has gone out on medical leave at approximately the same time" each year for "the same reason each

time," but that plaintiff "does not complain about her head, leg, and back until it is time for her to go on leave again." The complainant maintained that plaintiff "will not go to a company doctor" because she "knows a company doctor will not find anything wrong with her."

On July 8, 2015, Donna Krisanda, Cooper's Human Resources (HR) Manager, received an email from Butts, plaintiff's coworker, complaining that plaintiff's leave, which was "during the same time [in] the summer months" as her prior leaves, was "a slap in the face for the rest of us who come to work every[ ]day." Butts attached several photos purportedly posted by plaintiff to social media, including a photo "which show[ed] [plaintiff] in a swimming pool with small children and another which showed a pool with the caption, . . . 'Summer don't get no better then [sic] this had the pool all to myself today." The photos also depicted plaintiff at a carnival and attending a graduation party.[4]

After receiving the complaints, Cooper retained a private investigation firm, PrimeSource Investigation (PrimeSource), to conduct surveillance of plaintiff and document her activities and physical capabilities. After three days

_____

[4] At her deposition, Butts acknowledged that she had never reviewed plaintiff's medical records and was unaware of her medical diagnosis. Butts also acknowledged that none of the photos depicted plaintiff engaged in any strenuous physical activity.

of surveillance, PrimeSource reported observing plaintiff "entering and operating a vehicle, smoking cigarettes, transporting several individuals, and conducting errands" during which she "lift[ed] and carr[ied] several food items, ben[t] at the waist, and plac[ed] them in her vehicle." PrimeSource's report noted that "[n]o braces or other orthopedic devices were observed on or about [plaintiff]'s body."

Based on PrimeSource's report, indicating that plaintiff engaged in a variety of physical activities without any apparent discomfort or difficulty, Cooper determined that plaintiff had fraudulently misrepresented her inability to work in order to obtain a leave of absence. On August 7, 2015, after being instructed by the HR manager and the general counsel to terminate plaintiff, Lorraine Raimo, the director of operations for the medical practice where plaintiff worked, notified plaintiff during an in-person meeting that Cooper was terminating her employment for falsifying her medical leave application.[5] During the meeting, as instructed, Raimo asked plaintiff whether she had discussed with co-workers that she "watch[ed] [her] grandchildren during the

_____

[5] At her deposition, Raimo testified she did not personally review any doctor's note directing that plaintiff be placed on medical leave. Raimo stated she "assume[d] [plaintiff] had one" in order for her leave extension request to have been approved. Raimo also acknowledged she had no reason to doubt the validity of the doctor's note.

summer," and plaintiff responded that she had. Raimo testified she had been directed to ask the question to confirm allegations that plaintiff was "tak[ing] leaves every year to take care of her grandchildren."

Raimo later memorialized her conversation with plaintiff in a letter dated August 18, 2015, which stated:

> As a follow up to our conversation on August 7, 2015, this letter serves as confirmation of your termination from employment with Cooper . . . . As indicated when we spoke, your termination is based on fraudulent behavior. Information that we have been provided contradicts that you have a serious condition that makes you unable to perform your job.

On August 16, 2015, about a week after she was orally terminated, plaintiff filed an application for Social Security Disability Insurance (SSDI) benefits, certifying that she "became unable to work because of [her] disabling condition on May 15, 2015[,]" and she was "still disabled." In the application, plaintiff acknowledged that "anyone who makes . . . a false statement or representation of material fact in an application or for use in determining a right to payment . . . [of SSDI benefits] commits a crime." Further, she "affirm[ed] that all information . . . [she provided] in connection with th[e] claim [was] true." In supporting functional assessment reports dated August 21, and October 19, 2015, plaintiff reiterated her physical and functional limitations, stating she has

"a hard time sitting or standing for periods of time" because of "chronic pain." She stated she could "only walk . . . for about [fifteen] minutes before having to sit[,]" and she could not "pay attention" when she was in pain.  Additionally, on January 12, 2016, approximately five months after her termination, plaintiff was deposed in the Wawa lawsuit, and testified that she stopped looking for a job because she could not "sit[,]" "stand[,]" or "walk" for "long periods of time because [she was] always in severe pain."

Medical reports submitted in connection with plaintiff's SSDI application underscored plaintiff's physical and functional limitations.  In a September 15, 2016 comprehensive psychiatric examination, plaintiff told the examining psychologist that she was unable to "sit or stand for long periods of time without being in excruciating pain" and was unable to work because of "severe pain with [her] back and neck."  In a September 16, 2016 report, plaintiff told the examining nurse practitioner that she had "an average pain level of [eight] to [nine]" for her "neck" and "[nine] to [ten]" for her "lower back" "on [a zero to ten] pain scale."  According to plaintiff, "[t]he pain [was] worsened by walking, standing, . . . sitting, bending forward, twisting, or . . . lifting a heavy weight." Plaintiff's application for SSDI benefits was approved on November 22, 2016,

following a hearing before an administrative law judge. In 2017, plaintiff began receiving SSDI benefits, retroactive to November 2015.

On January 23, 2017, plaintiff filed a three-count complaint against Cooper and Raimo, alleging that defendants wrongfully terminated her employment by unlawfully discriminating and retaliating against her because of her disability, as well as failing to reasonably accommodate her disability, in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49.

To "establish a prima facie case" of disability discrimination in a termination context, plaintiff was required to offer evidence that "(1) she [was] disabled within the meaning of the LAD; (2) she 'was performing [her] job at a level that met [her] employer's legitimate expectations'; (3) she was discharged; and (4) [her] employer sought someone else to perform the same work after she left." Grande v. St. Clare's Health Sys., 230 N.J. 1, 17-18 (2017) (second and third alteration in original) (quoting Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363, 382 (1988)). When the focus is upon the second element of plaintiff's proofs, all that plaintiff is required to demonstrate at the outset is that she "was actually performing the job prior to the termination." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 454 (2005). To set forth a prima facie case of

retaliatory discharge, plaintiff was required to offer evidence that (1) she engaged in protected activity known to Cooper, (2) she was thereafter subjected to an adverse employment action, and (3) there was a causal link between the two. Jamison v. Rockaway Twp. Bd. of Educ., 242 N.J. Super. 436, 445 (App. Div. 1990).

Once a prima facie case of either discrimination or retaliation has been established, Cooper's "burden varies depending on whether [it] seeks to establish the reasonableness of the otherwise discriminatory act or advances a non-discriminatory reason for [plaintiff's] discharge." Jansen, 110 N.J. at 382. In the latter case, the burden of going forward shifts to Cooper to articulate some legitimate non-discriminatory or non-retaliatory reason for the adverse action, and if such a reason has been set forth, then plaintiff must demonstrate by a preponderance of the evidence that a discriminatory intent motivated the employer's action. Ibid.; Jamison, 242 N.J. Super. at 445. This can be done by proving that the articulated reason is a pretext for the discrimination or retaliation or that a discriminatory reason was more likely Cooper's motivation. Ibid.; Jansen, 110 N.J. at 382-83. If that burden is met, then a presumption of retaliatory intent arises that Cooper can dispel by proof, by a preponderance of

the evidence, that it would have taken the adverse action regardless of retaliatory intent. Jamison, 242 N.J. Super. at 445-46.

To set forth a prima facie case of discriminatory discharge for failure to accommodate her handicapped status under the LAD, plaintiff was required to present proof that (1) she was handicapped, (2) she was otherwise qualified to perform the essential functions of the job, with or without the accommodation by Cooper, and was performing at a level that met Cooper's expectations, (3) she was fired, and (4) Cooper then sought someone to perform the same work. Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 597 (1988); Svarnas v. AT & T Comms., 326 N.J. Super. 59, 73 (App. Div. 1999) (citing Maher v. New Jersey Transit Rail Operations, Inc., 125 N.J. 455, 480-81 (1991)).

Making a reasonable accommodation for a disabled employee requires an "interactive process" in which "both [the] employer and employee bear responsibility for communicating with one another to 'identify the precise limitations resulting from the disability and potential reasonable accommodation that could overcome those limitations.'" Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 422 (App. Div. 2001) (quoting Smith v. Midland Brake, 180 F.3d 1154, 1171 (10th Cir. 1999)). In order to show that Cooper failed to participate in the interactive process, plaintiff was required to

demonstrate that Cooper knew of her disability, that plaintiff requested accommodation or assistance, that Cooper did not make a good faith effort to assist her in seeking accommodation, and that plaintiff could have been reasonably accommodated but for Cooper's lack of good faith. Id. at 423 (quoting Taylor v. Phoenixville School Dist., 184 F.3d 296, 315-16, 319-20 (3d Cir. 1999)).

During her deposition, plaintiff testified she had not worked since her termination from Cooper, and she had no plans of applying for employment in the future. She testified that although she had accepted a position as a waitress sometime in 2017, she quit after about "a day or two" because "[i]t was too hard on [her] back." Following the close of discovery, over plaintiff's objection, defendants moved for summary judgment on all three counts, arguing that plaintiff failed to establish a prima facie case of disability discrimination, retaliation, or failure to accommodate because the discovery revealed that plaintiff would not have been able to perform the essential functions of her job had she returned from medical leave.

On June 7, 2019, during oral argument, the motion judge pointedly questioned plaintiff's counsel on how plaintiff could demonstrate that she was able to perform the job in order to establish a prima facie discrimination claim

in light of plaintiff's admissions in the Wawa lawsuit and the SSDI case that she could not work. Counsel responded that although plaintiff sustained "permanent injuries" from "the Wawa fall[,]" she was not "permanently disabled[,] . . . never said that she could [not] work," and, in fact, "worked after [the fall]." Counsel added that none of plaintiff's doctors stated she was permanently disabled, and plaintiff was not "declared to be permanently disabled until two years [later]." Counsel also pointed out that Cooper did not fire plaintiff because she was unable to perform the job, but because Cooper was "frustrated [that] she was out on leave." Counsel asserted the determination on plaintiff's SSDI application was therefore immaterial as to whether she could work at the time of her termination or upon her scheduled return from leave.

The judge then turned his inquiry to defense counsel, who responded that plaintiff was "confusing and conflating two separate issues" because "[w]e don't get to the issue of why Cooper fired her if she [cannot] show she can[] work." Defense counsel stressed that plaintiff "has for the last . . . four years consistently said over and over and over again, in three different legal forums, I can't work, I can't work, I can't work, I can't work." Counsel also pointed out that plaintiff produced "no expert report" indicating that "[she] was able to work" in "August 2015[,]" when she was terminated. Counsel added that

15

because plaintiff could not establish a prime facie case, "it almost does [not] matter why Cooper fired her[,]" but even if it did, Cooper had a "legitimate nondiscriminatory reason" for her termination in that Cooper "honestly believe[d] she fraudulently requested leave."

The judge then posited,

> Here's my problem. A jury's going . . . to see . . . [the SSDI application], I can't work, I can't do anything. They're going to see deposition transcripts from the Wawa case, interrogatories, everything. I can't work, I can't work. Can you do anything? I can't do anything. Can you lift anything? I can lift a pound of cheese and I can lift a two[-]liter bottle of soda. That's her testimony. That's the limit of her ability to lift. She works in a medical office. . . . What's a jury going to do with that . . . ? They're going to say, ah, you know what? That's wrong. She couldn't work.
>
> . . . .
>
> [A]t some point the question is whether or not she is actually disabled, and I think [defense counsel] makes a good point.
>
> When we're technically looking at an LAD case and applying the law, plaintiff has the burden of proof, has to prove certain things. Can she?

Plaintiff's counsel responded, "these are factual issues for a jury, . . . not [the court]." The judge continued,

> I'm not ruling on this matter yet. I'm going to look it over because I want to take a look. What

16

happens to me sometimes in a case is at the end of the case the jury looks and says, you can see it in their face[s], Judge, how did this get this far? It's crazy. We went through all this for this?

And my question is, . . . if the jury finds that she says she couldn't work, how do we get past prong number . . . two? How do we say that she was able to work. And we can talk about doctors and you're telling me everything. What we're not addressing is the fact that she admitted so much and so damaging almost to the point . . . where . . . how could a jury find . . . that she was able to work?

Following oral argument, on June 26, 2019, the judge issued an order granting defendants' motion for summary judgment and dismissing plaintiff's complaint with prejudice. A notation on the bottom of the order stated "[r]easons set forth [o]n the [r]ecord."[6] However, the judge did not provide an oral decision during the June 7 hearing, or a written or oral decision thereafter. This appeal followed.

On appeal, plaintiff primarily argues that, "despite . . . material questions of fact and credibility," the judge "committed reversible error when [he] usurped the role of the jury [by] . . . weigh[ing] the evidence and speculat[ing] how a jury might view the material facts and credibility of the parties." Plaintiff asserts

_____

[6] The order also indicated that the motion was "unopposed."

that although she is now deemed permanently disabled, there are disputed material facts as to whether she was permanently disabled when she was terminated. Additionally, there are disputed material facts as to whether defendants' proffered reason for terminating her was pretextual. Further, plaintiff asserts she "can easily demonstrate a prima facie showing to the jury that the only reason for her termination was her request for an extension of her medical leave[,]" thus establishing that defendant retaliated against her for making the request, and failed to engage in the interactive process or afford her a reasonable accommodation by granting her the extended medical leave.

We review a grant of summary judgment applying the same standard used by the trial court. Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016). That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted.
>
> [Ibid. (citations omitted) (quoting R. 4:46-2(c)).]

18

At the summary judgment stage, it is "not the court's function to weigh the evidence and determine the outcome but only to decide if a material dispute of fact exist[s]." Gilhooley v. Cty. of Union, 164 N.J. 533, 545 (2000) (citing Brill, 142 N.J. at 540). However, "[i]f there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a 'genuine' issue of material fact for purposes of Rule 4:46-2." Brill, 142 N.J. at 540. Further, if "the evidence is utterly one-sided[,]" a trial court has the authority to "decide that a party should prevail as a matter of law." Gilhooley, 154 N.J. at 455 (citing Brill, 142 N.J. at 540). Whereas our review of the facts must comply with Brill's standards, our review of the law is plenary. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

When a judge issues an order granting summary judgment, the "judge is required to detail the findings of fact and conclusions of law in a written or oral opinion . . . . Those findings and conclusions must then be measured against the standards set forth in [Brill, 142 N.J. at 540]." Allstate Ins. Co. v. Fisher, 408 N.J. Super. 289, 299-300 (App. Div. 2009) (citations omitted) (quoting Great Atl. & Pac. Tea Co. v. Checchio, 335 N.J. Super. 495, 498 (App. Div. 2000)). Indeed, Rule 4:46-2(c) specifies that "[t]he court shall find the facts and state its

conclusions in accordance with [Rule] 1:7-4." Rule 1:7-4(a) provides, in pertinent part, that "[t]he court shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon . . . on every motion decided by a written order that is appealable as of right . . . ."

The purpose of Rule 1:7-4 "is to make sure that the court makes its own determination of the matter." In re Tr. Created by Agreement Dated Dec. 20, 1961, by & between Johnson & Hoffman, Lienhard & Perry, 399 N.J. Super. 237, 254 (App. Div. 2006). As long recognized by our Supreme Court, "[n]aked conclusions do not satisfy the purpose of R. 1:7-4[,]" Curtis v. Finneran, 83 N.J. 563, 570 (1980), and "[f]ailure to make explicit findings and clear statements of reasoning [impedes meaningful appellate review and] 'constitutes a disservice to the litigants, the attorneys and the appellate court.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Curtis, 83 N.J. at 569-70). Indeed, "[n]either the parties nor the appellate court is 'well-served by an opinion devoid of analysis or citation to even a single case.'" Fisher, 408 N.J. Super. at 300 (quoting Checchio, 335 N.J. Super. at 498).

The manner in which a judge complies with Rule 1:7-4(a) is left to "the sound discretion of the trial judge." In re Tr. Created by Agreement Dated Dec. 20, 1961, 399 N.J. Super. at 253. A judge may rely upon reasons expressed by

a party "as long as the judge makes such reliance explicit." Id. at 253-54 (citing Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 1:7-4 (2006)). In that regard, the judge must make "clear the extent of [the judge's] agreement with and reliance on [the] proposed findings of fact and conclusions of law[,]" and must demonstrate by "clear evidence that the . . . judge carefully considered the evidentiary record and did not abdicate his decision-making responsibility." Id. at 254.

Here, the judge failed to make written or oral findings of fact and conclusions of law as required under Rule 1:7-4(a) in adjudicating the summary judgment motion.[7] The colloquy with counsel during oral argument falls far short of satisfying the rule. "While the failure to provide reasons necessitates a remand, we are left with the option of remanding for a statement of reasons or reversing and remanding for consideration of the motion . . . anew. We determine that the latter course of action is appropriate here" and "[w]e take no position as to the merits." Fisher, 408 N.J. Super. at 303. We therefore vacate the order under review, and remand for the judge to conduct oral argument, consider the motion anew, and enter a new order together with a written

---

[7] Neither party moved for a limited remand to require the motion judge to issue a statement of reasons.

A-4954-18T2

statement of reasons in conformity with <u>Rule</u> 1:7-4(a).  The remand proceeding shall be conducted within forty-five days of the date of this opinion.

Reversed and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.  Any further appellate review must be sought by a timely post-remand application.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4954-18T2